**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>LESTROY BRIGHT, )<br>)<br>Defendant. )<br>_____) | Criminal Action No. 2000-0004 |

**Attorneys:**
**Natasha Baker, Esq.**
St. Thomas, U.S.V.I.
   *For the United States*

**John Gleeson, Esq.**
**Steven G. Tegrar, Esq.**
New York City, NY
**David J. Cattie, Esq.**
St. Thomas, U.S.V.I
**Katherine L. Heath, Esq.**
San Francisco, CA
   *For Defendant Lestroy Bright*

## <u>MEMORANDUM OPINION</u>

THIS MATTER comes before the Court on Defendant Lestroy Bright's ("Defendant") "Motion to Reduce [] Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)" (Dkt. No. 470) ("Instant Motion") and the Government's Opposition thereto (Dkt. No. 480). The Court held a hearing on the Instant Motion on December 3, 2025. For the reasons discussed below, the Court will grant the Instant Motion. In view of the Defendant's serious medical condition, the Court will reduce Defendant's period of incarceration to time served, and will leave in place Defendant's three-year period of supervised release and the conditions associated therewith.

# I.    BACKGROUND

## A.  Procedural History

On December 22, 2000, Defendant was convicted by a jury of three counts of robbery affecting interstate commerce, in violation of the Hobbs Act (18 U.S.C. § 1951); three counts of use of a firearm during a crime of violence (in violation of 18 U.S.C. § 924(c)(1)); and certain local offenses.[1]  These charges arose from a series of robberies committed by Defendant and his accomplices against businesses on St. Croix between February 12, 1997 and February 21, 1997.

On December 19, 2001, the Honorable Raymond L. Finch sentenced Defendant to 675 months (fifty-six years and three months) imprisonment for the Hobbs Act Robbery and firearms convictions.[2]  (Dkt. No. 471-7 at 57-58).  Defendant was also sentenced to three years of supervised release.  *Id*. at 58.  He began his federal sentence on March 20, 2002 and is projected to be released on February 21, 2049.  (Dkt. No. 383-2 at 10).  He is currently imprisoned at Federal Correctional Institution Pollock ("FCI Pollock"), in Pollock, Louisiana.

On May 20, 2020, Defendant filed a "Motion for Compassionate Release" ("First Motion") pursuant to 18 U.S.C. § 3582.  (Dkt. No. 383 at 1).  In his First Motion, Defendant requested: (1) a reduction in his sentence to time served and probation and/or supervised release; (2) a transfer of supervision to the Southern District of Texas; and (3) a direction to the Bureau of Prisons ("BOP") to transfer Defendant to his sister's residence for home healthcare services.  *Id*. at 3.  Defendant argued that such relief was warranted because he was suffering from a weakened medical condition due to "a series of ischemic and hemorrhagic strokes [that have] permanently disabled [him] as a

---

[1] The local offenses were five counts of Robbery in the First Degree (14 V.I.C. §§ 1862 and 11) and two counts of Possession of a Firearm during the Commission of a Crime of Violence (14 V.I.C. §§ 2253(a) and 11).

[2] The Third Circuit Court of Appeals affirmed Defendant's convictions in 2002.  *See United States v. Bright*, 54 F. App'x 765 (3d Cir. 2002).

result." *Id.* at 1. Additionally, Defendant cited the risk to his health due to "the continuing COVID-19 pandemic[.]" *Id.* at 3.

On August 4, 2020, the Court denied Defendant's First Motion. *United States v. Bright*, 2020 WL 4495271 (D.V.I. Aug. 4, 2020) (Dkt. Nos. 393, 394). In denying the First Motion, the Court found that, while Defendant had satisfied the procedural requirements to bring a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), he had not demonstrated "extraordinary and compelling" reasons to justify compassionate release. 2020 WL 4495271 at *2-3. In this regard, the Court relied on the "Reduction in Sentence Medical Review" conducted by BOP on April 10, 2020, and found that, "while Defendant has significant deficiencies at this time and will need long term physical and occupational therapy, he is slowly improving and can recover and perform by himself if there are no complications. He is not terminal and his condition is not deteriorating." *Id.* The Court also noted, based on the BOP Medical Review, that Defendant was "receiving rehabilitative care from a therapist and 24-hour nursing care." *Id.* The Court further found that, even with Defendant's medical issues at the time, the risk posed by the ongoing COVID-19 pandemic did not constitute an extraordinary and compelling reason that would warrant compassionate release. *Id.* at *4.

On August 19, 2020, Defendant and his fellow inmate, Calvin Lewis ("Lewis"), submitted letters to the Court. (Dkt. No. 398, 399). In Defendant's letter, he requested "a second chance at life" and expressed regret for his past decisions. (Dkt. No. 398 at 1). In Lewis' letter, he stated that he shares a cell with Defendant and assists Defendant due to his physical limitations caused by his stroke. (Dkt. No. 399 at 1). Lewis asserted that Defendant "should be release[d] . . . because this BOP facility is not [equipped] to help Mr. Bright." *Id.* Lewis also stated that Defendant was convicted of multiple violations of 18 U.S.C. § 924(c) and those sentences were stacked, which is

now prohibited under the First Step Act.[3]  *Id.*  The Court viewed these letters as submissions supplementing Defendant's First Motion and denied the requested relief because the letters did not "present[] any evidence that Bright's prognosis or other circumstances [had] changed in a way that would affect the Court's prior analysis."  *United States v. Bright*, 2021 WL 330239 at *3 (D.V.I. Feb. 1, 2021) (Dkt. No. 409).  Further, in response to Lewis' reference to sentence stacking, the Court noted that "[a] motion for compassionate release is an improper vehicle to adjudicate that issue."  *Id.* at n.3.

On July 11, 2022, Defendant filed a "Motion for Reduction of Sentence Under the Compassionate Release Statute" ("Reconsideration Request") (Dkt. No. 421) and two supplements thereto (Dkt. Nos. 422, 423).  The Court construed this motion and its supplements collectively as a request for reconsideration of the Court's ruling on Defendant's First Motion.  (Dkt. No. 428 at 1).  In his Reconsideration Request, Defendant again raised the stacking argument that Lewis discussed in his August 19, 2020 letter.  (Dkt. Nos. 421, 422, 423).  Defendant noted that if he were to be sentenced today, following the First Step Act's revisions to § 924(c), "his total term would be . . . 26 years [and] 3 months," rather than fifty-six years and three months.  (Dkt. No. 421-1 at 3).  He further argued that he should qualify for compassionate relief, as he is "paralyzed on the entire left side of his body as a result [of] a stroke that further caused him to use a walker, cane and wheelchair" and he is in serious risk of contracting COVID-19 because he suffers from "conditions such as high blood pressure and obesity."  (Dkt. No. 421-1 at 4-5).  On March 7, 2023, the Court found that Defendant raised both arguments—paralysis and COVID-19—in his previous filings (Dkt. Nos. 383 at 2-3; 383-2 at 13-14; 399 at 1) and that his "condition and his risk of

---

[3] While the Court recognized that Lewis—as a non-attorney—could not represent Defendant, the Court nonetheless took Lewis' letter into consideration when rendering its subsequent ruling. (Dkt. No. 409 at 4 n.2).

contracting COVID-19 did not constitute extraordinary and compelling reasons to grant his release." (Dkt. No. 429 at 8). Specifically, the Court found that Defendant's Reconsideration Request "presents no new evidence that his prognosis or other circumstances have changed in a way that would affect the Court's prior ruling." *Id*. at 8. Having concluded that "Defendant's health condition is insufficient to show extraordinary and compelling circumstances to warrant compassionate release and Defendant's stacked sentences play no role in changing that result," the Court denied the Reconsideration Request. *Id*. at 10.

In the Instant Motion, Defendant argues that three different "extraordinary and compelling" circumstances—which were amendments to the preexisting Guidelines and took effect in November 2023—justify his release: (1) he "is suffering from a serious medical condition, from which he is not expected to recover, that 'substantially diminishes' his ability to provide self-care" in the BOP environment, making U.S.S.G. § 1B1.13(b)(1)(B) applicable; (2) his "medical condition requires long-term and specialized care that BOP is not currently providing, which puts [him] at risk of serious deterioration in health" making U.S.S.G. § 1B1.13(b)(1)(C) applicable; and (3) he "presents a combination of circumstances that warrants relief under U.S.S.G. § 1B1.13(b)(5), including his young age at the time of the offense and the conditions of his confinement."[4] (Dkt. No. 470 at 2). Defendant represents that, upon release, he would "seek entry into a residential reentry and rehabilitation facility"—ideally in Texas "close to two of his sisters,

---

[4] Defendant raises a fourth basis for the Instant Motion. (Dkt. No. 470-1 at 6 n. 2). He argues that "the non-retroactive change in § 924(c)'s mandatory sentencing regime, in light of the other facts of the case, presents an extraordinary and compelling reason warranting a reduction under § 1B1.13(b)(6)." *Id*. However, Defendant recognizes that "the Third Circuit's decision in *United States v. Rutherford*, 120 F.4th 360 (3d Cir. 2024), precludes relief under that subsection at this time" and therefore makes this argument "for preservation purpose[s] only." *Id*. In light of Defendant's acknowledgement that this argument is foreclosed by *Rutherford*, it will not be addressed in this Opinion.

upon whom he can rely to assist in his day-to-day life— where he can access "the physical therapy, occupational therapy, and speech therapy he needs."  (Dkt. No. 470-1 at 19-20).

### B.  Defendant's Medical Conditions

On March 10, 2020, Defendant suffered a stroke caused by a complete blockage in the right middle cerebral artery of his brain.  (Dkt. No. 471-1 at 2).  After stabilizing Defendant at Penrose Hospital in Colorado Springs, Colorado, doctors performed an invasive procedure to remove the arterial blockage.  (Dkt. No. 478-1 at 132).  Upon his discharge from the Intensive Care Unit ("ICU") on March 16, 2020, Defendant was transferred to St. Francis Hospital's Neuro and Rehabilitation Center ("St. Francis").  (Dkt. No.478-2 at 147).  While at St. Francis, Defendant received daily physical therapy, occupational therapy, speech therapy, and 24-hour rehabilitation nursing care.  *Id*. at 125, 147, 150; (Dkt. No. 478-1 at 130).

On May 11, 2020, St. Francis informed BOP that Defendant could be discharged, but would need to continue physical therapy, occupational therapy, and speech therapy.  (Dkt. No. 478-2 at 121).  On May 12, 2020, a BOP doctor met with Defendant at St. Francis, and the BOP doctor's report cleared Defendant for release back to BOP while informing St. Francis that Defendant "would not have access to inhouse or frequent physical therapy[.]"  *Id*. at 117.  The BOP doctor determined that "there was not an indication that [Defendant] needed daily [physical therapy] at discharge."  *Id*.  However, the report noted that Defendant "would be best managed at a medical center so he may continue to progress with physical therapy on outpatient basis."  The discharge report prepared two days later by St. Francis recommended that Defendant continue to receive physical therapy, as well as speech language therapy, five times a week.  *Id*. at 148, 151.  Further, St. Francis noted that despite being "initially . . . prescribed a carbon fiber [Ankle-Foot

Orthosis ("AFO")]" an "off-the-shelf plastic AFO" was given to Defendant as the "carbon fiber AFO . . . had rivets in it and he cannot take this into the prison system." (Dkt. No. 478-1 at 130).[5]

On May 14, 2020, Defendant was discharged from St. Francis to the custody of BOP and placed in the Special Housing Unit at FCC Florence, out of concern that he would be unable to defend himself in the general population. *Id*. at 121, 147. At the time of his discharge from St. Francis, Defendant was recorded as having "left upper extremity weakness but improving strength" and he was "begin[ning] to touch his chin" with "slight grip and limited extension." (Dkt. No. 478-1 at 130).

It is unclear how much physical therapy Defendant received from this point forward. The medical records provided include only two references to meetings with a physical therapist in the years between his discharge from St. Francis and 2023.[6] On January 13, 2021, Defendant was given a telehealth physical therapy evaluation by a BOP physical therapist. (Dkt. No. 478-2 at 68). The evaluation report, noted that Defendant, despite having greatly improved since his initial stroke, still requires the use of an AFO, assistance with cutting up his food, assistance making up his bed, and assistance removing his shower curtain during cell moves. *Id*. Further, the report stated that Defendant "utilize[s] his right side for functional mobility" and had low strength on his left side, requiring the use of a cane to walk. *Id*. The report recommended that Defendant receive assistive devices to help with eating—such as a plate with an inside lip to help him cut his own food—and an "exercise program to continue utilizing and integrating [his] left side . . . for overall

---

[5] BOP may have provided Defendant with a new, plastic AFO on November 5, 2021. (Dkt. No. 478-2 at 24). At that time, BOP noted that Defendant had "a weakness or deformity of the knee, ankle, and/or foot which requires stabilization" and that his "condition is expected to be permanent or to last longer than 6 months." *Id*. at 25.

[6] The Court was provided with medical records through 2023.

better functionality moving forward." *Id*. There is no indication that Defendant ever received any such assistive device.

On February 1, 2021—over eight months after Defendant's discharge from St. Francis—the medical director of FCI Florence recommended Defendant's redesignation to another facility, stating that "he has not had any structured PT since his hospital discharge as [FCI Florence] does not have PT services available." (Dkt. No. 471-4 at 2). At this time, Defendant was classified as a Care Level 4.[7] (Dkt. No. 471-4 at 2).

On April 20, 2021, Defendant was transferred to the St. Thomas More Rehabilitation Center ("St. Thomas More") where he had the second of the two meetings with a physical therapist reflected in the medical records. (Dkt. No. 478-2 at 107). There, he was seen by the Therapy Department for 45 minutes. *Id*. At this time, St. Thomas More noted that "his biggest deficits are that he is unable to open his [left] hand and unable to walk normally due to the weakness in the [left] ankle." *Id*. at 107. St. Thomas More's evaluation indicated that Defendant "would benefit from skilled physical therapy to address [his] physical impairments" and that his "rehab potential is fair." *Id*. at 109. St. Thomas More recommended the following plan for Defendant's care:

> Patient have access to 3 pages of [home exercise program ("HEP")] provided and yellow putty exercises 2x/day, 3-5x/week as able. Due to the severity of patient's symptoms, requesting patient have authorization for additional 8 [outpatient ("OP")] PT visits to advance exercises, progress gait pattern, and improve functional ability of the [left] shoulder, elbow, wrist, and hand. Also requesting an OT referral be provided to [soft tissue mobilization] OP Rehab to provide patient with additional assistance on his [left upper extremity] mobility and bracing as indicated.

---

[7] BOP classifies Care Level 4 as applying to inmates who "require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited inpatient care. Functioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance." BOP, *Care Level Classification for Medical and Mental Health Conditions or Disabilities* ("*BOP Care Level Classifications*") at 3 (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. The BOP lists a stroke patient as an example of a Care Level 4 inmate. *Id*.

Therapy will consist of and not be limited to:
> Manual therapy to improve flexibility, soft tissue mobility, joint mobility to return to [activities of daily living ("ADLs")][8]
>
> Therapeutic exercises to improve strength and flexibility
>
> Gait training to improve safety and normal gait pattern
>
> Aquatic therapy for strength, balance and pain control
>
> Functional Dry needling to decrease muscle tension and improve muscle activation
>
> Neuromuscular re-education to improve balance posture and stability
>
> Ice / heat / [ultrasound] / E[lectrical ]stim[ulation] / Iontophoresis with dexamethasone for pain management
>
> Education in a HEP to improve function and ADLs

*Id*.

Following this appointment, Defendant was returned to BOP custody the same day with "putty and putty exercises." *Id*. at 61. However, "due to the security issue of the inmate having putty in the special housing unit," he was not allowed to keep the putty. The medical records do not reflect that Defendant was given any substitute for the putty, although he was allowed to keep the paper containing the exercises he was meant to be doing with the putty. *Id*. Defendant's medical records do not reflect any physical therapy appointments from this point forward.[9]

During this period, Defendant's care level at BOP was steadily decreasing. On March 24, 2021, Defendant was identified as a Care Level 3 (Dkt. No. 478-2 at 63)—down from the Care Level 4 at which he was classified in February 2021 (Dkt. No. 471-4 at 2). BOP's reason for this decision is not recorded.[10] *Id*. Less than a month later, on April 6, 2021, BOP revised Defendant's

---

[8] BOP defines ADLs as "[a]ctivities including eating, urinating, defecating, bathing, and dressing/undressing." *Supra, BOP Care Level Classifications* at 3.

[9] The Court notes that Defendant has not submitted medical records for 2024-2025.

[10] BOP classifies Care Level 3 as applying to inmates who are outpatients but "have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications," and

Care Level to a Care Level 2. *Id.* Again, the reason for this decision is not recorded.[11] *Id.* at 62.

Then, on October 15, 2021, the BOP reclassified Defendant—again without any recorded reason—

to a Care Level 1, which is the level he holds today. (Dkt. No. 471-3 at 3). According to BOP

guidance, this means that Defendant is "generally healthy" and has "limited medical needs that

can be easily managed by clinician evaluations every 6-12 months."[12] FEDERAL BUREAU OF

PRISONS, CARE LEVEL CLASSIFICATION FOR MEDICAL AND MENTAL HEALTH CONDITIONS OR

DISABILITIES 3 (May 2019). In line with BOP Policy, this classification means Defendant is

provided the same level of medical care as someone with "mild asthma" or "diet-controlled

diabetes." *Id.*

It is unclear from the record exactly at what point Defendant began to rely on his wheelchair

as his primary means of mobility. However, as reported by his counsel—and affirmed by Lauren

Stebbins, a law student who visited Defendant over the course of two days in 2023, and who

provided an affidavit in support of the Instant Motion (Dkt. No. 471-6 at 3)—at present, Defendant

can walk only very short distances and relies primarily on his wheelchair.

---

who "may require assistance with some activities of daily living (ADLs) that can be accomplished by inmate companions." *Supra, BOP Care Level Classifications* at 3.

[11] BOP classifies Care Level 2 as applying to inmates are "who require clinician evaluations monthly to every 6 months" and whose medical conditions can be managed "through routine, regularly scheduled appointments with clinicians for monitoring" with consultation from medical specialists only being required "from time to time." *Supra, BOP Care Level Classifications* at 2.

[12] The Care Level Classification System is meant to match "inmate health care needs . . . with institutions that can meet those needs." *Supra, BOP Care Level Classifications* at 1. Therefore, inmate care levels are determined based on their medical needs and based primarily on the nature of the services they require, while institutions are assigned "institution care levels" which reflect their clinical capabilities and health care resources. *Id.* FCI Pollock, where Defendant is currently incarcerated, is assigned an institutional care level 1, meaning it has the clinical resources to care only for inmates that are "generally healthy" and whose medical needs can be managed by an annual or bi-annual clinical evaluation. *Id.*; DISTRICT OF COLUMBIA CORRECTIONS INFORMATION COUNSEL, FEDERAL BUREAU OF PRISONS INSTITUTIONS AND THEIR DISTANCE, SECURITY, HEALTH, AND MENTAL LEVELS AS OF JANUARY 2025.

Given that Defendant's left hand is stuck in a permanent fist, he can only propel forward with his right hand. (Dkt. No. 471-6 at 2-3). He counterbalances this motion with his left foot—despite being unable to bend his left knee—to prevent himself from making continuous right turns, which would result in him wheeling in circles instead of moving forward. *Id.* Therefore, when Defendant does not have someone available to push his wheelchair for him, he moves "very slowly." *Id.* It appears that Defendant frequently relies on the good will of other inmates to move about the prison facility. On June 30, 2023, BOP records reflect that Defendant missed an appointment as there was no one available to assist him in rolling his wheelchair. (Dkt. No. 278-2 at 157). Further, it has been reported that on at least one occasion, he arrived to visitation with another inmate pushing his chair, and on another occasion when it was necessary for him to propel he was the last prisoner to arrive to the visitation room. (Dkt. No. 471-6 at 1). There is no indication that Defendant has ever regained the ability to cut his own food, make his bed, or move his belongings during cell moves without assistance from others.

Defendant's medical records reflect a consensus from all care providers who have examined him that it is highly improbable that he will experience significant recovery of his mobility in the future. On April 6, 2021 a BOP Medical Doctor reported that Defendant "is now 1 [year] out from [his stroke]. [Physical Therapy/Occupational Therapy is] unlikely to improve his strength and [range of movement] at this point and may only benefit in regards to teaching adaptive function." (Dkt. No. 478-2 at 62). On December 18, 2024,[13] Dr. Natasha Lee, having reviewed "over 1000 pages" of Defendant's medical history noted in her Declaration that Defendant was

---

[13] Although the year is not included as part of the date with Dr. Lee's signature on her Declaration (471-1 at 7), the Court has determined the year to be 2024 by comparing the dates of the medical records that Dr. Lee reviewed, *id.* at 2, information on Dr. Lee's resume, *id.* at 8, and the date of the filing of the Instant Motion.

reengaged in therapy at the BOP seven months after his discharge from the rehabilitation facility. (Dkt. No. 471-1 at 5-6).[14]  Dr. Lee stated that during this period "he likely lost a lot of function that he gained from his initial rehabilitation." *Id.*  Dr. Lee further described the medical importance for stroke patients to continue with therapy following discharge from rehabilitation centers, as "the longer patients go without therapies from the initial injury, the harder it is to recover function at a later date."  (Dkt. No. 471-1 at 5-6).

## II.    APPLICABLE LEGAL PRINCIPLES

Upon a motion by the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A) ("Section 3582"),[15] a court is permitted to reduce a term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) where "extraordinary and compelling reasons warrant such a reduction," the defendant is "not a danger to the safety of any other person or to the community,"[16] and such a reduction is "consistent with applicable policy statements" issued by the United States Sentencing Commission.  18 U.S.C. § 3582(c)(1)(A); *see also* U.S.S.G. § 1B1.13(a).  As Section 3582 does not define "extraordinary and compelling reasons," district courts look to the Sentencing Commission's policy statements, for a "working definition" of the phrase.  *United States v. Stewart,* 86 F.4th 532, 533 (3d Cir. 2023).

---

[14] Dr. Lee is an attending physician in the Department of Pediatric Palliative Care at Dell Children's Medical Center and an Assistant Professor at University of Texas Austin Dell Medical School.  (Dkt. No. 471-1 at 2).  She cares for patients with multiple medical conditions, including those who have suffered a stroke, and has cared for incarcerated individuals in several states.  *Id.* She submitted a Declaration in support of the Instant Motion, in preparation for which she asserted that she reviewed over 1000 pages of Defendant's medical records spanning from 2019 to 2023. *Id.*

[15] This subsection is "commonly referred" to as the "Compassionate Release" provision. *United States v. Stewart*, 86 F.4th 532, 533 (3d Cir. 2023).

[16] *See* 18 U.S.C. § 3142(g).

"A sentencing court must first conclude, as a matter of law, that a prisoner is *eligible* for a sentence reduction before it decides whether he *qualifies* for a reduction.  The two concepts– eligibility and qualification–sound similar, but they are distinct."  *United States v. Rutherford*, 120 F.4th 360, 364 (3d Cir. 2024), *cert. granted*, 145 S. Ct. 2776 (2025).  "Whether any given prisoner has established an extraordinary and compelling reason for release" is the "threshold question" for *eligibility* for compassionate release.  *Stewart*, 86 F.4th at 535.  After a defendant is found eligible, "sentencing courts are then permitted 'to exercise broad discretion' to determine whether and to what extent the prisoner warrants, or, in other words, is *qualified* for, a sentence reduction." *Rutherford*, 120 F.4th at 364 (emphasis added).  Whether to grant a motion for compassionate release is a "purely discretionary decision."  *Stewart*, 86 F.4th at 534.

In November 2023, following the Court's denial of Defendant's Reconsideration Request, the United States Sentencing Commission added new grounds to its list of "extraordinary and compelling reasons[.]"  U.S.S.G. § 1B1.13(b).  Critical to the Court's consideration of this matter is U.S.S.G. § 1B1.13(b)(1)(B),[17] which states that an "extraordinary and compelling reason[]" can be established if a defendant is (i) "suffering from a serious physical or medical condition," (ii) "suffering from a serious functional or cognitive impairment," or (iii) "experiencing deteriorating physical or mental health because of the aging process," and such condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."[18]

---

[17] Prior to 2023, this subsection was identified as an "extraordinary and compelling reason" in the Application Notes of U.S.S.G. § 1B1.13, but was not included in the Guideline itself.

[18] As noted elsewhere in this opinion, Defendant also makes arguments pursuant to U.S.S.G. § 1B1.13(b)(1)(C) and U.S.S.G. § 1B1.13(b)(5).  However, because the Court will grant the requested relief under U.S.S.G. § 1B1.13(b)(1)(B), the Court need not reach these alternative arguments.

Following a determination of whether an "extraordinary and compelling reason" makes a defendant eligible for compassionate release, the Court exercises much broader discretion, and looks to the Section 3553(a) factors in determining if defendant qualifies for compassionate release. 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13(a). Pursuant to Section 3553(a), the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, considering, *inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentences available;" the Sentencing Guidelines' policy statements; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). Further, any modified sentence imposed must: reflect the seriousness of the offense, promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.*[19]

---

[19] The United States Sentencing Commission Guidelines provides in Application Note 2 to § 1B1.13 that "[b]efore granting a motion pursuant to 18 U.S.C. § 3582(c)(1)(A), the Commission encourages the court to make its best effort to ensure that any victim of the offense is reasonably, accurately, and timely notified, and provided, to the extent practicable, with an opportunity to be reasonably heard, unless any such victim previously requested not to be notified." In accordance with this Application Note, the Court instructed the Government—the party which had access to the victims' last know addresses and contact information—to contact the victims and inquire into whether they would like to make a written statement to the Court. (Dkt. No. 483). As requested by the Government, the deadline for the submission of any such statements was December 22, 2025. (Dkt. No. 488). On December 22, 2025, the Government informed the Court that "[a]ttempts were made to contact all victims," and that "no victim has reach[ed] out to the US Attorney's [O]ffice indicating whether they have received correspondence or to provide a victim statement." (Dkt. No. 489).

## III.  DISCUSSION

The crux of the issue presented by the Instant Motion is whether Defendant's medical condition has presented "extraordinary and compelling" circumstances such that he is eligible and qualified for the requested relief.  Therefore, the Court will discuss whether his medical condition fits within the rules and policy descriptions of the United States Sentencing Commission.

### A.  Law of the Case Doctrine

In opposing the Instant Motion, the Government relies heavily on the argument that "[t]he law of the case doctrine, although not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons."  (Dkt. No. 480 at 5).  The Government asserts that the Instant Motion "includes more attachments and supporting documents" but that "the facts surrounding the defendant's medical condition" are "no different" than those "available to the court" at the times the Court denied Defendant's previous motions for compassionate release. *Id.*  The Government argues that, in fact, Defendant's physical state seems to have improved since his first motion for compassionate release. *Id*.  Therefore, the Government argues that the Court should not change its analysis of Defendant's circumstances upon consideration of the Instant Motion. *Id*.

The Government's reliance on the law-of-the-case doctrine is misplaced.  Generally, the law-of-the-case doctrine does not apply to "new information and argument." *Hamilton v. Leavy*, 2005 WL 475442 at *2 (D. Del. Mar. 1, 2005).  Indeed, the Third Circuit, and its panels, have held that the law of the case doctrine does not preclude reconsideration of previously decided issues when "new evidence is available" or "a supervening new law has been announced[.]" *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998); *United States v. Zareck*, 662 F. App'x 110, 114 (3d Cir. 2016); *Aleynikov v. Goldman Sachs Grp., Inc.*, 2022 WL 421398 at *1 (3d Cir. Feb. 11, 2022).

The Instant Motion relies on three new or amended U.S. Sentencing Commission Guidelines as the bases for its argument, and therefore presents "new" legal arguments which were not made in Defendant's prior motions for compassionate release.  Additionally, the Instant Motion includes an abundance of medical records not previously provided to the Court.  These records contain significant new information regarding Defendant's medical condition, including that Defendant is "unlikely to improve his strength and [range of movement] at this point[.]"  (Dkt. No. 478-2 at 62).  This stands in sharp contrast to the information provided to the Court on previous occasions, which indicated that "while Defendant has significant deficiencies at this time and will need long term physical and occupational therapy, he is slowly improving and can recover and perform by himself if there are no complications."  (Dkt. No. 394 at 7).

A court may grant a renewed or new motion for compassionate release when a defendant presents evidence that his or her medical condition is worsening, or not improving as expected. *Cf. United States v. Brown*, 2020 U.S. Dist. LEXIS 90187 at *3 n.1, *10 (E.D. Pa. May 22, 2020).[20] The Court also finds it significant that Defendant's level of care has been revised dramatically over the years by the BOP, from a Level 4—which contemplates an individual who may require 24-hour skilled nursing care—to a Level 1—which contemplates a generally healthy individual whose medical needs can be managed with evaluations every six to twelve months.

Thus, as the court in *Brown* noted, "much has changed"—both legally and factually—since the Court's initial review of Defendant's first motion for compassionate release and the two

---

[20] The Defendant in *Brown* was initially denied compassionate release when diagnosed with a form of blood cancer. *Brown, 2020 U.S. Dist. LEXIS 90187* at *1.  However, on a renewed motion for compassionate release, the Court noted that "much has changed since the Court issued that Order . . . Brown's condition has not improved in the way her doctors had hoped it would at this stage . . . Thus, the Court now finds that extraordinary and compelling reasons justify Brown's immediate release from imprisonment."  *Id*.

supplemental submissions. The doctrine of the law of the case is therefore inapplicable under the circumstances here. *In re City of Philadelphia Litig.*, 158 F.3d at 718; *Hamilton* 2005 WL 475442 at *2.

**B. "Extraordinary and Compelling Reasons"**

Pursuant to Guideline § 1B1.13(b)(1)(B), an extraordinary and compelling reason for compassionate release is established when (1) the defendant is "suffering from a serious physical or medical condition"; (2) that condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility"; and (3) the defendant "is not expected to recover from the condition."

As noted earlier, as a result of Defendant's stroke he suffers from paralysis on the left side of his body, leaving him unable to use his left hand or bend his left leg. (Dkt. No. 471-6 at 2-3). There can be no doubt that Defendant's left-side paralysis is, on its face, a "serious physical or medical condition," and the Government does not dispute this proposition. (Dkt. No. 487 at 68).

The Court also finds that Defendant's left-side paralysis substantially diminishes his ability to provide self-care within the environment of a correctional facility. As reported by his counsel and Ms. Stebbins, Defendant's paralysis makes him reliant on a wheelchair which he cannot operate smoothly. He is thus left to depend on either propeling himself "very slowly" with only one hand or relying on the goodwill of other inmates to move around the facility. (Dkt. No. 471-6 at 2-3). He cannot cut his own food, make his own bed, or move his belongings during cell moves without assistance. (Dkt. No. 478-2 at 68). His counsel further asserted at oral argument that Defendant has not experienced any improvement in his ability to complete these tasks in the time since the Instant Motion was filed. (Dkt. No. 487 at 12).

Taken together, the Court concludes that Defendant's left-side paralysis "substantially diminishes" Defendant's ability to "provide self-care within the environment of a correctional

facility." *United States v. Mapuatuli*, 2021 WL 473719 at *4 (D. Haw. Feb. 9, 2021).  In this regard, the circumstances here are akin to those in *Mapuatuli*, where a district court granted a reduction of sentence to a defendant suffering from left-side paralysis as a result of a stroke, together with other medical concerns.  *Id*. at *1.  Notably, the Court in *Mapuatuli* explicitly referenced the fact that the defendant was "unable to move the left side of his body" and held that

> [t]his, alone, is sufficient to meet [the self-care] prong of the analysis.  It is not hard to imagine that basic aspects of self-care, such as dressing oneself, bathing, using the bathroom, and moving about the correctional facility to engage in these activities, are substantially affected by his left-side paralysis.  And tending to his own varied medical ailments and treatment protocols—an aspect of self-care—is, undoubtedly, affected by his paralysis.

*Id*. at *4.  The Court agrees, and deems these concerns equally applicable here.

Finally, Defendant "is not expected to recover from [his] condition."  U.S.S.G. § 1B1.13(b)(1)(B).  On April 6, 2021 a BOP doctor noted that, at the one year mark following Defendant's stroke, physical therapy is "unlikely to improve his strength and [range of movement] at this point."  (Dkt. No. 478-2 at 62).  In 2024, Dr. Lee reached the same conclusion, noting that as Defendant was only reengaged in any sort of therapy at the BOP seven months after his discharge from the rehabilitation facility, "he likely lost a lot of function that he gained from his initial rehabilitation."  (Dkt. No. 471-1 at 6).  Further, in the five years that have passed since Defendant's release from St. Francis, there is no indication that his condition has improved, or that it ever will.  Therefore, the Court finds that Defendant satisfies the final prong of the analysis in that he "is not expected to recover from" his left-side paralysis.  U.S.S.G. § 1B1.13(b)(1)(B).

As Defendant's left-side paralysis satisfies the three requirements for his medical condition to constitute an "extraordinary and compelling reason" pursuant to U.S.S.G. § 1B1.13(b)(1)(B),

the Court finds that he is eligible for compassionate release on this basis.[21]  *See Mapuatuli*, 2021 WL 473719 at *3.

### C.  Dangerousness Analysis

In order to grant compassionate release, 18 U.S.C. § 3582(c)(1)(A) also requires the court to find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  In determining the safety of the community upon a defendant's release, Section 3142(g) requires the Court to consider: "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm"; "the weight of the evidence against the person"; the history and characteristics of the person, including physical and mental condition, family ties . . . . financial resources. . . . past conduct, history relating to drug or alcohol abuse, criminal history"; and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

Defendant argues that, while there is no reason to believe he would pose a danger even if healthy, his partial paralysis and reliance on a wheelchair ensures he will not be a danger to the public.  (Dkt. No. 470-1 at 19).  The Court agrees that Defendant's partial paralysis addresses any concern regarding Defendant's danger to the community.

Courts frequently find that a defendant's physical disability ensures he or she will not pose a danger to the safety of the community.  *See, e.g., United States v. Clyne*, 2019 WL 3292349 at *2 (D. Idaho July 22, 2019) ("The defendant's crime was serious, but defendant's physical decline

---

[21]  Defendant makes additional arguments, in the Instant Motion—that "extraordinary and compelling reasons" for his compassionate release have been established pursuant to U.S.S.G. § 1B1.13(b)(1)(C) and U.S.S.G. § 1B1.13(b)(5).  As the Court has already determined that Defendant is eligible for the requested relief pursuant to the "extraordinary and compelling reason[s]" described in U.S.S.G. § 1B1.13(b)(1)(B), it need not consider the issue of whether Defendant would also be eligible under U.S.S.G. § 1B1.13(b)(1)(C) or U.S.S.G. § 1B1.13(b)(5).

[requiring the use of a pacemaker and a walker] makes it unlikely that he will reoffend, and the Court finds that he is not a danger to any person or to the community."); *United States v. Bellamy*, 2019 WL 3340699 at *6 (D. Minn. July 25, 2019) (holding that despite the seriousness of his offense and his criminal history, a defendant with "serious, deteriorating conditions and dependence upon a wheelchair and assistance from a helper is not a danger to any person or the community") (citation modified)); *Mapuatuli*, 2021 WL 473719 at *4-5 (finding that as a result of defendant's partial paralysis following a stroke, he did not pose a danger to the safety of the community upon release.). Similarly here, while the crimes committed by Defendant were unquestionably serious ones, the Court finds that, given Defendant's current physical condition and his release plan to seek needed therapeutic care in a residential reentry and rehabilitation facility, he is not a danger to the safety of any other person or to the community.

### D.  18 U.S.C. § 3553(a) Analysis

Finally, the Court exercises broad discretion under Section 3553(a) in determining if Defendant qualifies for compassionate relief. Defendant argues that "there is no doubt that Bright's time served reflects the seriousness of the offense . . . given that his sentence today would likely be far less than half of the sentence he is serving, and he would likely have been home many years ago." (Dkt. No. 470-1 at 18). At this stage, the Court may consider intervening changes in the law, including the change in law regarding the "stacking" of 18 U.S.C. § 924(c) mandatory minimums.

> [I]n holding that the statutorily required sentence or Congress's nonretroactive sentencing reductions are not extraordinary and compelling reasons for purposes of § 3582(c)(1)(A), we are not saying that they are always irrelevant to the sentence-reduction inquiry. If a prisoner successfully shows extraordinary and compelling circumstances, the current sentencing landscape may be a legitimate consideration for courts at the next step of the analysis when they weigh the § 3553(a) factors.

*United States v. Andrews*, 12 F.4th 255, 262 (3d Cir. 2021). This ruling was relied upon by the district court in *United States v. Ali*, which granted a reduction of sentence to a defendant who was found guilty of three armed robberies.  738 F.Supp.3d 584 (E.D. Pa. 2024).  In its ruling, the *Ali* Court observed, *inter alia*, that the thirty-two year sentence was "without question, unusually long," noting:

> [w]hile these crimes were serious offenses that merited severe punishment, Congress's passage of the First Step Act precluding stacking of § 924(c) sentences constitutes a clear recognition that [defendant's] current sentence goes beyond what is sufficient and may be a "greater than necessary" imposition of sentence.  Indeed, [his] sentence is more than double what Congress has now deemed an adequate punishment for comparable § 924(c) conduct.

738 F.Supp.3d at 598 (citation modified).

Defendant asserts that if he were sentenced today, it would be legally permissible for a sentencing court to impose a sentence as short as fifteen years (the mandatory time on the § 924(c) counts) and one day.  (Dkt No. 470-1 at 8); *see Dean v. United States*, 581 U.S. 62, 69-70 (2017) (authorizing a one-day consecutive sentence for predicate crimes when Defendant is also being sentenced on § 924(c) convictions).  Defendant additionally asserts that reduction of his sentence to time served "could not conceivably undermine respect for the law or fail to provide for just punishment" and is warranted due to his age—49 at the time the Instant Motion was filed—and poor health, as these reduce his chance of recidivism.  (Dkt. No. 470-1 at 19).

At oral argument, the Government raised that Defendant has been convicted of a serious crime, which had a lasting, traumatic impact on his victims, who were held at gunpoint in the course of his three robberies.  (Dkt. No. 487 at 97-98).  The Government also noted that Defendant had one infraction in his disciplinary record since having his stroke, in which he attempted to possess a weapon.  *Id.* at 117.

The Court in no way discounts the heinous nature of Defendant's crimes and the severe impact on the victims, nor does it diminish Defendant's prior criminal record and his infraction while incarcerated. However, under Section 3553(a), the Court balances these factors with those previously highlighted by Defendant—including his medical condition, and a comparison of the period of incarceration that he has already served with what he would likely have served if sentenced today. The Court also takes into account Defendant's release plan, in that it contributes to his unlikelihood of recidivism. Defendant has represented that he would "seek entry into a residential reentry and rehabilitation facility where he can get the physical therapy, occupational therapy, and speech therapy he needs." (Dkt. No. 470-1 at 19-20). At the Hearing on the Instant Motion, Defendant's counsel further represented that Defendant's sister operates a nursing home and rehabilitation facility in Texas, and would offer Defendant a bed in that facility if given a release date. (Dkt. No. 487 at 23:15-20).

The Court finds, upon balancing the foregoing circumstances, Defendant qualifies for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

## IV.  CONCLUSION

Upon consideration of the foregoing, the Court finds that Defendant is both eligible and qualified for compassionate release. Therefore, the Court will grant Defendant's "Motion to Reduce [] Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)" (Dkt. No. 470). Based on Defendant's serious medical condition, the Court will reduce Defendant's sentence to time served—a period of approximately twenty-five years. Further, this Court agrees with the sentencing court that a three-year term of supervised release—the maximum allowable by statute for each count for which Defendant was sentenced, and which must be served concurrently—is appropriate. (Dkt. No. 471-7 at 81). Thus, this Court will order Defendant to commence his three years of supervised release

upon his release from incarceration. All other conditions of the Sentence imposed on December 19, 2001, as memorialized in the Judgment dated January 1, 2002 (Dkt. No. 240) as amended on January 25, 2002 (Dkt. No. 266)[22]—including the payment of restitution—shall remain in full force and effect.[23] As Defendant will now be released from custody, the Court will deny as moot Defendant's other motions seeking a reduced sentence or vacatur of his sentence. (Dkt. Nos. 331, 344, 347, 352, 261, 278).

An appropriate Order accompanies this Memorandum Opinion.

Date: February 13, 2026

_____/s/_____
WILMA A. LEWIS
Senior District Judge

---

[22] The Judgment was amended to correct a clerical mistake. (Dkt. No. 266 at 1).

[23] Defendant must report to the United States Office of Probation and Pretrial Services within 72 hours of his release from custody. (Dkt. No. 266 at 3). Defendant shall refrain from any unlawful use of a controlled substance, and submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer. *Id.* Defendant shall not possess a firearm as defined in 18 U.S.C. § 921. *Id.* Defendant shall pay any restitution that remains unpaid at the commencement of the term of supervised release. *Id.* Defendant shall comply with the standard conditions of supervised release. *Id.* Defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until the financial obligations imposed are fully satisfied. *Id.* at 1. Restitution in the amount of $13,866.00 was ordered at the time of sentencing. *Id.* at 5. As of February 9, 2026, the Court understands that $10,640.21 in principal and $7,112.60 in interest are outstanding. These amounts are subject to confirmation with the United States Attorney's Office for the District of the Virgin Islands, which maintains these records.